HURLEY, Judge.
Defendant, Joseph Aiello, appeals his convictions and sentences imposed after three verdicts of guilty of engaging in common bookmaking schemes contrary to Section 849.25(3), Florida Statutes (1975). We affirm in part and reverse in part.
The information charged the defendant with three separate counts of bookmaking in violation of Section 849.25(3), Florida Statutes (1975).[1] Subsection one of the statute defines “bookmaking” as “the taking or receiving of any bet or wager.” Subsection three of the statute lists three types of activity which, if proven, will upgrade the penalty for bookmaking from a first degree misdemeanor to a third degree felony. The activities are: (1) receiving or accepting more than five bets in any one day; (2) receiving bets totaling more than $500.00; or, (3) engaging in a common bookmaking scheme with three or more persons.
Through a statement of particulars, the state advised the defendant that he was being charged with the last mode of activity, i. e., engaging in a common bookmaking scheme with three or more persons. The state further specified that count one allegedly occurred on November 21, 1975, count two on November 22, 1975 and count three on November 23, 1975. The case was tried by a jury which found the defendant guilty of all counts. The court thereupon adjudicated the defendant guilty of each count and imposed a sentence of three concurrent prison terms of eighteen months, followed by three years probation and a fine of $1,250.00.
I
Though neither party to this appeal has suggested that the imposition of three sentences may constitute multiple punishments for a single crime, we conclude that such is the case. Moreover, the error is fundamental and, consequently, may be considered on appeal despite the lack of an objection below. Mims v. United States, 375 F.2d 135 (5th Cir. 1967); Castor v. State, 365 So.2d 701 (Fla.1978); Clark v. State, 336 So.2d 468 (Fla. 2d DCA 1976), aff'd 363 So.2d 331 (Fla.1978).
It is a basic precept of constitutional law that the double jeopardy clause of the Fifth Amendment protects against multiple punishments for the same offense. Illinois v. Vitale, - U.S. -, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); Whalen v. United States, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). Whether an information charges multiple conspiracies or a single ongoing conspiracy depends upon analysis of the proof adduced at trial, but it is certain “that a single agreement to commit an offense does not become several conspiracies because it continues over a period of time.” Braverman v. United States, 317 U.S. 49, 52, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942). Indeed, this rule was laid down over thirty years before Braverman by Mr. Justice Holmes in Unit *1207 ed States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124,126, 54 L.Ed. 1168 (1910), when he said:
But when the plot contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one.
The state is not free to arbitrarily decide whether there is one agreement or several. United States v. Palermo, 410 F.2d 468 (7th Cir. 1969). The issue must be resolved by an analysis of the proof adduced at trial. As the court noted in United States v. Perez, 489 F.2d 51, 57 (5th Cir. 1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974), distinguishing between one overall conspiracy and several separate conspiracies is “a frustrating and challenging task.” The court further held that:
In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, then it is one conspiracy. Id. at 62.
Turning to the evidence in the case at bar and viewing it in the light most favorable to the state, and giving the state the benefit of all inferences to be drawn therefrom, Tegethoff v. State, 220 So.2d 399 (Fla. 4th DCA 1969), we find proof of only one common bookmaking scheme. The record is replete with continuing instructions on how each participant was to fulfill his role in accepting and transmitting bets. Indeed, the key participants remained the same throughout the three day conspiracy. The evidence portrays the defendant Aiello as the head man and operational core of an ongoing bookmaking ring. No other interpretation is possible. Thus, as a matter of law, the defendant could not be convicted nor sentenced, for more than one offense. Therefore, defendant’s convictions and sentences for counts two and three must be reversed.
II
Defendant’s major thrust on appeal is the contention that the evidence adduced at trial is insufficient to establish a common bookmaking scheme with three or more persons. He argues that at best, the state proved his involvement with three individual bettors which, as a matter of law, is inadequate. The state accepted defendant’s characterization of the evidence and maintained that individual bettors may be counted to satisfy the statute’s numerical requirement of three or more persons. We believe the state’s position is incorrect,[2] but we need not treat this issue exhaustively since the evidence presented at trial conclusively shows that the defendant engaged in a common bookmaking scheme with three or more persons who, themselves, were also engaged in taking or receiving bets. In other words, they were more than individual bettors.
In Tegethoff v. State, supra, the court enunciated the appropriate appellate standard by which a claim of insufficiency of evidence should be measured:
In examining a record to determine the sufficiency of evidence, an appellate court *1208 need only find substantial competent evidence to support the verdict. The verdict and judgment carry a presumption of correctness; hence, all inferences to be drawn from the evidence are to be drawn in favor of the verdict and judgment. Id. at 400.
Since the defendant apparently failed to object to the manner in which a single conspiracy was charged in three counts, and because he was fully advised of the dates and individuals involved, we view the information as charging a single common scheme extending from November 21,1975 through November 23, 1975. Given the defendant’s contention that the evidence adduced at trial was insufficient to support a conviction, our task on appeal is to determine whether the state’s evidence established a common bookmaking scheme between the dates specified, and with three or more persons from those listed on the statement of particulars,[3] who satisfy the statute’s requirements.
The linchpin in the state’s evidence was a series of fifteen intercepted telephone conversations between the defendant and an individual named Angelo Congiunti. Mr. Congiunti’s home telephone had been tapped pursuant to a court order, the validity of which is not before us. After listening to the tape recorded telephone conversations, the jury heard Captain Joseph Pierce of the Broward County Sheriff’s Office explain several of the terms used during the conversations. Captain Pierce also offered his opinion on the structure of the bookmaking organization and the roles of the various participants. Viewing this body of evidence from the Tegethoff perspective, there is substantial competent evidence to support a finding that Mr. Aiello was the “head man” or “banker” of an ongoing bookmaking operation which had interlocking connections with other bookmaking organizations. Angelo Congiunti served as Aiello’s “clerk”, the person responsible for manning the phones, accepting bets and reporting to the head man or banker. The evidence also shows that the Aiello group transferred most of its bets to another bookmaking organization run by a person known as “Jigger”. Thus, the foregoing evidence establishes that the defendant, Aiello, was engaged in a common bookmaking scheme with at least two other individuals, viz., Angelo Congiunti and Jigger. The evidence further discloses that Jigger often communicated with the Aiello group through an assistant known as “Joe”. However, we do not consider Joe as the third participant in the common bookmaking scheme since the state failed to list his name on its statement of particulars.
The evidence, however, does provide a third individual by the name of “Billy” who meets the criteria for a member of a common bookmaking scheme. A brief synopsis of the testimony will suffice to demonstrate that Billy was more than an individual bettor; he was a bookmaker in his own right who accepted bets and, in turn, placed them with the Aiello organization. In call # 5 on November 22, 1975, between Angelo and the defendant, Angelo relates that Jigger instructed him to call off some bets because of a mistake in the point spread. Angelo then says, “Now I called Billy, I said, ‘Bill— he said, ‘How am I going to get it off?’, he said, ‘Who am I going to call to get it off, the guy’s got the bet in.’ ” In call # 11, made on the same day, Angelo reports Billy’s bets as follows: “Pittsburgh plus 9, a 100 times, that’s $5,1 mean $500; then he’s got Tennessee minus 2 and V2 again, 10 times, that’s $50; then he’s got California minus a point and xk again, 20 times, that’s $100.. . Then he’s got Penn State minus 4, . . . only 10 times though, $50; then he’s got Michigan State minus 7.. ., for twenty times, $100.. .. Now you put down this here, ‘Jack C-o-r, Jack Cor,’ that’s Billy, but I put him under another name... . He’s got Pittsburgh plus 9, $200... . ” Later in the same conversation, Angelo states: *1209 “Billy’s got to call me back anyway, he might have more stuff. I told him no later than quarter to one, I got to call it in.”
In call # 16 on November 23, 1975, Angelo tells the defendant of Billy’s inquiries as to when he will be paid. Angelo quotes Billy as saying, “You know, I don’t know, should I send in a lot of action?” Angelo responded, “Look, what can I tell ya, you know.” Angelo, referring to Billy, then said to the defendant: “Ya, I mean, you know, he wants me to be on beck and call, like, he wants me like, if he calls at ten o’clock, I’m here with the spread, you know, a call like at two in the morning, you know what I mean? He wants me to be around like for twenty hours while he’s taking action.” (Emphasis supplied).
With respect to the last quoted conversation, Captain Pierce testified that taking “action” refers to accepting a bet. (Tr. 93). Thus, by evaluating the evidence in the light most favorable to upholding the jury’s verdict, and construing all inferences to be drawn therefrom in favor of the verdict and the judgment, we find that the state proved Billy to be a bookmaker and not a mere bettor. The prosecution thereby met its burden of establishing that the defendant, Aiello, engaged in a common bookmaking scheme with three or more persons, viz., Angelo Congiunti, Jigger, and Billy, all of whom were also involved in taking or receiving bets. Since the judgment of conviction for count one is supported by substantial evidence, it is affirmed.
Accordingly, the judgment of conviction and sentence for count one is affirmed. The judgments of conviction and the sentences imposed for counts two and three are reversed and the cause is remanded to the trial court with instructions to vacate and set aside the judgments and sentences for counts two and three.
ANSTEAD, J., concurs.
LETTS, C. J., concurs specially with opinion.

. Section 849.25(3), Florida Statutes (1975) provides:
“Whoever engages in bookmaking to the extent that in any one day he receives or accepts more than five bets or receives bets totaling more than $500, or engages in a common bookmaking scheme with three or more persons, is guilty of a felony of the third degree, punishable as provided in [section] 775.082, [section] 775.083, or [section] 775.084_

. If individual bettors could be counted as members of a common bookmaking scheme, then each bettor would be equally as culpable as the bookmaker himself and would be subject to prosecution for a second degree felony. This result cannot have been intended since there are separate statutes specifically covering bettors as distinct from bookmakers. (See for example Section 849.14) Further, if the State’s interpretation is accepted, the first part of Section 849.25(3) which makes it a second degree felony to engage in bookmaking to the extent that in any one day the bookmaker receives or accepts more than five bets would be meaningless. If bettors are to be included as part of a common bookmaking scheme, then any time a bookmaker receives or accepts three bets in a day, (from three separate bettors) rather than five bets, he can be convicted of a second degree felony under the common scheme portion of the subsection. Such a result cannot have been intended for it renders the five bet minimum mere surplusage.

. The statement of particulars contained the following list of alleged co-participants:
Count I: Angelo Congiunti, Jigger, Billy, and/or Eric.
Count II: Angelo Congiunti, Jigger, Billy, Eric, and/or Day.
Count III: Angelo Congiunti, Billy, Eric, Ray, Buddy, and/or Johnny Sicatano.